**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN MCFEE, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>CVS HEALTH CORPORATION, CVS HEALTH CORPORATION BENEFIT PLANS COMMITTEE, THE BOARD OF DIRECTORS OF CVS HEALTH CORPORATION, and JOHN DOES 1-50.<br><br>      Defendants. | Case No. 25-5984<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Dated: October 24, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Caroline C. Donovan
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
   cdonovan@bursor.com

*Attorneys for Plaintiff*

TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................... 1

PARTIES ............................................................................................................. 5

CLASS ALLEGATIONS ..................................................................................... 9

    I.      THE PLAN ............................................................................... 9

    II.     DEFENDANTS FAILED TO UPHOLD THEIR FIDUCIARY DUTIES REGARDING THE RKA FEES ..................................... 14

          A.     Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants Like the Plan Here ......................... 14

          B.     ERISA's Fee Disclosure Rule ................................................... 18

          C.     Much Information Regarding the Reasonableness of Fees for Recordkeeping Services is in the Sole Possession of Defendants ................................................... 19

    III.    THE PLAN PAID UNREASONABLE RECORDKEEPING FEES AND THE PLAN'S FIDUCIARIES FAILED TO ENGAGE IN A PRUDENT PROCESS TO EVALUATE RECORDKEEPING FEES .................................... 22

          A.     Vanguard as a Recordkeeper .................................................... 22

          B.     The Plan's Recordkeeping Services Agreement with Vanguard Should Have Been Comparable to Similar Plans Vanguard Managed ................................................... 23

          C.     The Plan's Recordkeeping Fees Were/Are Unreasonable When Benchmarked Against Other Similarly Situated Plans ................... 27

CLASS ALLEGATIONS ................................................................................... 30

CAUSES OF ACTION ...................................................................................... 31

PRAYER FOR RELIEF ..................................................................................... 36

JURY DEMAND ............................................................................................... 37

i

Plaintiff John McFee ("Plaintiff"), by and through his attorneys, on behalf of the CVS Health Future Fund 401(k) Plan (the "Plan"),[1] individually and on behalf of all others similarly situated, states and alleges as follows:

### NATURE OF THE ACTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include CVS Health Corporation, the Board of Directors of CVS Health Corporation and its members, the CVS Health Corporation Benefit Plans Committee, Administrative Subcommittee, Investment Subcommittee, and their respective members, and John Does 1-50 (collectively, "Defendants"), for breaches of their fiduciary duties.

2. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

3. Defendants, as ERISA fiduciaries, exercise discretionary authority or discretionary control over the Plan. Part of this requires Defendants to execute care, skill, prudence, and diligence when choosing a third-party service provider (i.e., a "recordkeeper") to record keep and

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

administer the plan, and to objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

4.      Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as "RKA."

5.      Defendants failed to uphold their fiduciary duties when evaluating the RKA fees that plan participants, including Plaintiff, had to pay.  As shown in the chart below reflecting participant costs from comparable plans in 2023, the Plan's cost per participant is *over quadruple the average fee of $8.32* per participant for the nine other plans listed:

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[2] |
|---|---|---|---|---|
| Lowes 401(k) Plan | 2023 | $8,108,634,836 | 147,562 | $7.97 |
| Google, LLC 401(k) Plan | 2023 | $39,047,152,408 | 152,158 | $7.97 |
| IBM 401 (K) Plus Plan | 2023 | $57,428,456,306 | 154,910 | $1.23 |
| Microsoft Corporation Savings Plus 401K Plan | 2023 | $53,225,853,429 | 172,201 | $2.97 |
| Starbucks Corporation 401(k) Plan | 2023 | $4,096,838,458 | 161,998 | $15.19 |
| Kaiser Permanente 401(k) Retirement Plan | 2023 | $19,708,272,899 | 175,631 | $12.23 |
| TJX - TJX Companies 401(k) Savings Plan | 2023 | $3,180,545,680 | 125,614 | $12.99 |
| Salesforce 401(k) Plan | 2023 | $7,317,484,047 | 53,709 | $11.52 |
| Intel 401(k) Savings Plan | 2023 | $22,179,181,890 | 82,693 | $2.82 |
| CVS Health Future Fund 401(k) Plan | 2023 | $27,588,812,025 | 223,622 | $34.14 |

---

[2] Cost-per-participant was calculated using the total recordkeeping fees reported in the Schedule H. If no recordkeeping fees were listed in the Schedule H, the calculation relied on the Schedule C, identifying fees paid to service providers with a service code of "15" and/or "64," which signify recordkeeping fees. *See* Instructions for Form 5500 (2023) at pg. 30 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf.  That total reported amount was divided by the number of participants with account balances as of the end of the plan year.

6.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[3]

7.      With regard to plan fees, the DOL states: "You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."[4]  It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan," *Tibble*, 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019).

8.      At all times during the Class Period, the Plan had at least $1 billion dollars in assets under management.  At the end of fiscal years 2022 and 2023, the Plan had over $24 billion dollars and $27 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.[5]

9.      The Plan is large in terms of the number of its participants. From December 31, 2022 to December 31, 2023, for example, the Plan had between 223,548 and 223,622 participants with account balances as of the end of the plan year.

---

[3] *See* U.S. DEP'T OF LABOR, *A Look at 401(k) Plan Fees*, available at https://www.dol.gov/node/63354#:~:text=401(k)%20plan%20fees%20and%20expenses%20gene rally%20fall%20into%20three,the%20plan%20as%20a%20whole (last accessed Aug. 17, 2025).

[4] *Id.*

[5] June 20, 2024 Report of Independent Auditors of the CVS Health Future Fund 401(k) Plan ("2024 Auditor Report"), at 4. The 2024 Auditor Report "audited the financial statements of the CVS Health Future Fund 401(k) Plan (the Plan), ... which comprise the statements of net assets available for benefits as of December 31, 2023 and 2022…." *Id.* at 1.

3

10.     Plans with large numbers of participants—like the Plan here—can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

11.     Not only does the number of participants add to the negotiating power of the Plan, but the Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2021, only 0.2% (1,011 of 641,747) of Plans in the country had more than $1 billion in assets under management.[6]  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendant, however, did not try to reduce the Plan's expenses to ensure they were prudent.

12.     Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's administrative and recordkeeping ("RKA") costs paid to Vanguard, the Plan's recordkeeper.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Defendants' actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     These objectively unreasonable RKA fees cannot be justified.  Prudent fiduciaries of 401(k) plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees.  Defendants engaged in a flawed and

---

[6] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2021*, (Aug. 2024), at 7, available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

imprudent decision-making and selection process by not subjecting its current recordkeeper to a competitive, recordkeeper bidding process during the Class Period, and continuing to monitor the market for RKA fees.

15.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence, failure to monitor fiduciaries, and for prohibited transactions.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

17.     This Court has personal jurisdiction over Defendants because they transact business in this District and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.  Venue is further proper because Plaintiff John McFee participated in the Plan while working for Defendant at a CVS located in Staten Island, New York.

19.     In conformity with 29 U.S.C. §1132(h), Plaintiff has mailed the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

### PARTIES

20.     **Plaintiff John McFee** resides in Staten Island, New York and was employed by Defendant CVS Health Corporation for approximately fourteen years as a staff pharmacist.  As a

staff pharmacist, Plaintiff McFee worked both full-time and part-time, handling vaccinations and much of the day-to-day legwork to keep the pharmacy running smoothly.  During his employment, Plaintiff participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs.  Mr. McFee suffered injury to his Plan account by overpaying for his share of RKA costs and losing out on investment.  Plaintiff participated in the Plan and had an account balance in the Plan from approximately 1999 through the present.  Plaintiff worked for Defendant at various CVS pharmacies, the most recent being in Staten Island, New York.

21.    Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct.  Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.    Plaintiff did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

23.    **Defendant CVS Health Corporation**.  CVS Health Corporation (the "Company") is the sponsor and administrator of the Plan with a principal place of business at 1 CVS Drive, Woonsocket, Rhode Island 02895.[7]  CVS Health Corporation is an American healthcare company that owns CVS Pharmacy, a retail pharmacy chain; CVS Caremark, a pharmacy benefits manager;

---

[7] The December 31, 2023 Form 5500 of the Plan filed with the United States Department of Labor ("2023 Form 5500"), at 1-2.

and Aetna, a health insurance provider, among other brands. CVS Health Corporation is the world's second largest healthcare company.

24. The Company, through the Board of Directors of CVS Health Corporation, appointed the Benefit Plans Committee to, among other things, ensure that the Plan's participants paid a reasonable rate for recordkeeping given the size of the Plan.[8] As will be discussed below, the Benefit Plans Committee fell well short of this fiduciary obligation. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25. Accordingly, the Company during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

26. **Board Defendants**. The Board of Directors of CVS Health Corporation (the "Board"), among other things, ensures that the investments available to the Plan's participants are appropriate, had no more expense than reasonable, performed well as compared to their peers and/or paid a reasonable rate for recordkeeping given the size of the Plan.

27. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. Here, the Board "appointed" "a committee" called the "Benefit Plans Committee" which Benefit Plans Committee has "the responsibility for carrying out the provisions of the Plan[.]"[9] As will be discussed below, the Benefit Plans Committee fell well short of this fiduciary obligation.

28. Accordingly, each member of the Board during the putative Class Period (referred

---

[8] *See, e.g.*, the 2024 Auditor Report, at 6 ("The general administration of the Plan and the responsibility for carrying out the provisions of the Plan are maintained by a committee (the 'Benefit Plans Committee')").

[9] *Id.*

to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Benefit Plans Committee. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

29. **Defendant CVS Health Corporation Benefit Plans Committee**. As discussed above, the Company and the Board Defendants appointed the Benefit Plans Committee to, among other things, ensure that the Plan's participants paid a reasonable rate for recordkeeping given the size of the Plan.[10] Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees. As will be discussed below, the Benefit Plans Committee, the Administrative Subcommittee, and Investment Subcommittee (collectively, the "Benefit Plans Committee"[11]) fell well short of this fiduciary obligation. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of plan assets are considered fiduciaries.

30. The Benefit Plans Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets and/or because the Benefit Plans Committee had a duty to monitor the actions of the Administrative Subcommittee and Investment Subcommittee.

---

[10] *See id.*

[11] *See id.* ("In accordance with the provisions of the Plan, the Benefit Plans Committee has appointed an Administrative Subcommittee (the 'Plan Administrator') and Investment Subcommittee and delegated certain fiduciary duties and responsibilities to each of the Subcommittees.").

31.    The Benefit Plans Committee and unnamed members of the Benefit Plans Committee during the Class Period (referred to herein as John Does 11-40), are collectively referred to herein as the "Benefit Plans Committee Defendants."

32.    **Additional John Doe Defendants**.  To the extent that there are additional officers, employees and/or contractors of Defendant CVS Health Corporation who are/were fiduciaries of the Plan during the Class Period, or were hired as investment manager(s) for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 41-50 include, but are not limited to, CVS Health Corporation officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**CLASS ALLEGATIONS**

**I.    THE PLAN**

33.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34)[12] in that the Plan provides for an individual account for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account.

34.    **Eligibility**.  In general, employees are eligible to participate in the Plan "as of the first of the month following their employment date."[13]

---

[12] 2024 Auditor Report at 6 ("The Plan is a defined contribution plan subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended.").

[13] *Id.*

35.    **Contributions**. "Participants may direct the Company to contribute 401(k) and/or Roth contributions ('elective deferrals') to their accounts as a percentage of their eligible compensation as defined in the Plan."[14]  "Each participant's total elective deferrals for any calendar year may not exceed the lesser of 75% of eligible compensation or the maximum elective deferral allowed by the Code. The maximum elective deferral amount allowed by the Code was $22,500 for 2023 and $20,500 for 2022."[15]

36.    With regard to matching contributions made by CVS Health Corporation: "The Plan provides a match of 100% up to 5% of an employee's eligible compensation contributed to the Plan per payroll. The maximum annual match per participant was $16,500 for 2023 and $15,250 for 2022."[16]

37.    Like other companies that sponsor 401(k) plans for their employees, the Company enjoys both direct and indirect benefits by providing matching contributions to the Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.[17]

38.    The Company also benefits in other ways from the Plan's matching program.  It is well-known that offering retirement plans can help in employers' efforts to attract new employees and reduce turnover.[18]

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *See generally* IRS, *401(k) Plan Overview*, available at https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

[18] *See, e.g.*, STARGARDEN, *Retirement Savings Plans Can Boost Employee Retention* (Aug. 13, 2024), available at https://blog.stargarden.com/test/retirement-savings-plans-can-boost-employee-retention-0 ("Recent studies emphasize the importance of retirement benefits in employee retention. According to a 2022 Global Benefits Attitudes Survey by WTW, nearly 60%

39.   Given the size of the Plan, the Company likely enjoyed a significant tax and cost savings from offering a match.

40.   **Vesting**.   "Participants are 100% vested at all times in participant and Company matching contributions. Participants are always fully vested in and have a non-forfeitable right to (1) their accounts upon retirement, death or disability, (2) any elective deferrals described in Note 1(c) and (3) any rollover amounts they make to the Plan."[19]

41.   **The Plan's Investments**.   The Plan's net assets available for benefits as of December 31, 2023 was $27,713,814,075.[20]

42.   **Payment of Plan Expenses**.   During the Class Period, administrative expenses, including recordkeeping fees, were paid for using the Plan's assets.[21]

43.   **The Plan's RKAs**. As discussed in depth below, ERISA fiduciaries are required to obtain information from various recordkeepers and compare the market to ensure plan participants are paying reasonable RKAs. However, Defendants did not do so.

44.   From information obtained through the DOL, Plaintiff has gleaned a historical snapshot of the RKA rates for the Plan, as well as other plans of similar size and scope:

//

//

//

//

//

---

of employees cited their employers' retirement benefits as a significant reason they remain with their current employer, compared to 41% in 2010[.]") (citation omitted).

[19] *Id.* at 7.

[20] *Id.* at 4.

[21] *Id.* at 7 ("Recordkeeping … fees were paid by the Plan for 2023 and 2022.").

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[22] |
|---|---|---|---|---|
| Lowes 401(k) Plan | 2022 | $7,355,936,526 | 149,935 | $8.81 |
| Google, LLC 401(k) Plan | 2022 | $28,898,202,210 | 148,787 | $14.45 |
| IBM 401 (K) Plus Plan | 2022 | $53,363,875,208 | 162,870 | $12.49 |
| Microsoft Corporation Savings Plus 401K Plan | 2022 | $39,602,667,639 | 166,621 | $5.53 |
| Starbucks Corporation 401(k) Plan | 2022 | $3,240,772,984 | 152,890 | $15.74 |
| Kaiser Permanente 401(k) Retirement Plan | 2022 | $16,058,823,184 | 159,120 | $10.52 |
| TJX Companies 401(k) Savings Plan | N/A | 2022 Form 5500 not available on DOL Form 5500 Search | | |
| Salesforce 401(k) Plan | 2022 | $5,696,765,553 | 55,168 | $25.02 |
| Intel 401(k) Savings Plan | 2022 | $18,361,585,903 | 84,543 | $2.32 |
| CVS Health Future Fund 401(k) Plan | 2022 | $24,237,200,876 | 223,548 | $29.08 |
| Lowes 401(k) Plan | 2021 | $9,466,550,339 | 158,184 | $9.26 |
| Google, LLC 401(k) Plan | 2021 | $30,556,649,022 | 124,725 | $16.48 |
| IBM 401 (K) Plus Plan | 2021 | $67,554,919,021 | 166,735 | $20.45 |
| Microsoft Corporation Savings Plus 401K Plan | 2021 | $48,020,791,784 | 148,956 | $6.81 |
| Starbucks Corporation 401(k) Plan | 2021 | $3,676,701,817 | 143,162 | $14.09 |
| Kaiser Permanente 401(k) Retirement Plan | 2021 | $18,614,838,105 | 149,636 | $12.07 |
| TJX Companies 401(k) Savings Plan | N/A | 2021 Form 5500 not available on DOL Form 5500 Search | | |
| Salesforce 401(k) Plan | 2021 | $6,089,494,511 | 49,396 | $24.67 |
| Intel 401(k) Savings Plan | 2021 | $21,524,243,697 | 78,265 | $2.16 |
| CVS Health Future Fund 401(k) Plan | 2021 | $28,826,912,417 | 212,836 | $28.09 |

45.    The chart also includes the Salesforce 401(k) Plan and Intel 401(k) Savings Plan, which have *less than* 100,000 participants, but were still able to command a lower cost per participant charge, further tipping in Plaintiff's favor.

46.    The Plan's recordkeeping fee continued to exceed, by far, the reasonable rate for a plan of its size:

//

---

[22] Cost-per-participant was calculated using the method described *supra* note 2.

12

| Year | Participants ("PP") | Vanguard Per Participant Charge ("PPC") | Total Direct Costs (PP x PPC) |
|---|---|---|---|
| 2024 | 230,636 | $23.54 | $5,431,119 |
| 2023 | 223,622 | $34.14 | $7,636,591 |
| 2022 | 223,548 | $29.08 | $6,501,866 |
| 2021 | 212,836 | $28.09 | $5,979,836 |
| 2020 | 205,769 | $86.57 | $17,814,551 |
| 2019 | 130,635 | $19.39 | $2,534,130 |

47.     In any event, there is no reasonable justification for the Plan to pay, on average, *over six million dollars more per year*[23] for recordkeeping for the same services.  Indeed, the Plan continues to pay more in recordkeeping fees in 2024 than it paid in 2019, despite having 100,000 more participants—which should have *lowered* Vanguard's per-participant charge.

48.     This is especially concerning given the fact that "a high fee may reflect imprudence even if the fee *falls* year-over-year." *Johnson v. PNC Fin. Servs. Grp., Inc* ., No. 2:20-cv-01493, 2021 WL 3417843, *4 (W.D. Pa. Aug. 3, 2021) (emphasis added).  After all, continuously paying excessive fees  without trying  to  negotiate lower  fees  or periodically benchmarking against  the market is a breach of fiduciary duty, regardless of fee consistency over time.

49.     But even as the number of Plan participants increased and the Plan's services stayed the same, there was no decrease in the Plan's recordkeeping fees. To the contrary, there was an *increase* in fees, even though the number of Plan participants have increased by nearly 100,000 participants during that time period and the Plan's recordkeeping services have not changed.

50.     As discussed *infra*, these charts exemplify Defendants' failure to uphold their duty to Plaintiff and the Plan as these fees are unreasonable.

---

[23] Calculated by taking $8,672,703 [the average Total Direct Cost for the years 2020-2024] - $2,534,130 [the Total Direct Cost in 2019].

## II.   DEFENDANTS FAILED TO UPHOLD THEIR FIDUCIARY DUTIES REGARDING THE RKA FEES

51.   As described above, Defendants were fiduciaries of the Plan.

52.   ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143 n.10 (1985)).

53.   "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."[24]

### A.   Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants Like the Plan Here

54.   The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's recordkeeper.

55.   Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order ("QDRO") processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

56.   There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following

---

[24] VANGUARD, *Best practices for plan fiduciaries,* at 36, available at https://web.archive.org/web/20220120144939/https://institutional.vanguard.com/iam/pdf/FBPB K.pdf; *see also* VANGUARD, *Fiduciary tool kit for financial professionals*, https://institutional.vanguard.com/content/dam/inst/iig-transformation/offers/vrpa/pdf/fiduciary-toolkit-for-financial-professionals.pdf, at 7 ("Does your organization ... Assess whether plan fees are reasonable?").

services:

- Basic account recordkeeping (*e.g.*, demographic, source, investment and vesting records);

- Multi-channel participant and plan sponsor access (*e.g.*, phone, web);

- Daily participant transaction accounting (*e.g.*, purchases, redemptions, exchanges);

- Payroll service (*e.g.*, hardships, in-service withdrawals, termination distributions);

- Participant tax reporting services (*e.g.*, IRS Form 1099-R);

- Participant confirmations, statements, and standard notices;

- Plan-level reporting and annual financial package (excluding IRS Form 5500);

- Participant education (*e.g.*, newsletters, web articles, standard communication materials); and

- Plan consulting (*e.g.*, preapproved document services, operational materials).

57.    These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

58.    The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. Recordkeepers for large 401(k) plans such as Vanguard, Fidelity, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

59.    The way it works, in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions

15

and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns. In this manner, a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping a participant's account with a balance of, for example, $500,000 is the same as for a participant whose account balances is $5,000 in the same plan.

60.    Recordkeepers for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans.

61.    The cost of providing recordkeeping services thus often depends on the number of participants in a plan.

62.    The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like Defendants' with large numbers of participants and large amounts of assets.

63.    When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. *See* DOL Study of 401(k) Plan Fees and Expenses (1998), at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size

16

increases.").[25]

64. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis. The actual cost of administrative services is more dependent on the number of participants in the plan. There is no logical or practical correlation between an increase in administrative fees and an increase in plan assets.[26]

65. Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

66. Although the 401(k)-participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

67. Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns. There is no rational economic reason for the recordkeeper, or account administrator, to receive increased revenues

---

[25] Available at https://www.dol.gov/sites/dolgov/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[26] "Fees, measured as a percentage of assets, tend to decline as account balances and number of participants increase." DELOITTE, *Defined Contribution / 401(k) Fee Study*, at 8, available at https://web.archive.org/web/20220423205109/https://www.ici.org/doc-server/pdf%3Arpt_09_dc_401k_fee_study.pdf; *see also* MERCER INVESTMENT CONSULTING, INC., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), at 5, available at https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf ("[A] per-participant fee is considered best practice and is in line with how recordkeeping costs are generated").

simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions.

68. During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant fee when evaluated on a per participant basis.

**B.    ERISA's Fee Disclosure Rule**

69. In 2012, the DOL published a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[27]

70. The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

71. As stated by the DOL: ERISA "require[s] plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is

---

[27] *See* U.S. D.O.L., *Fact Sheet, Proposed Regulation to Require a Guide to Assist Plan Fiduciaries in Reviewing 408(b)(2) Disclosures* (Mar. 2014), available at https://www.sparkinstitute.org/content-files/408b2_guide_fact_sheet_3-11-14.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."[28]

72.     The 408(b)(2) disclosures, in short, require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

73.     Plan sponsors, as ERISA fiduciaries, should obtain this information from various recordkeepers and compare the market to ensure plan participants are paying reasonable RKAs. However, Defendants did not do so.

74.     A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

75.     Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants.  Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)."  29 CFR § 2550.404a-5(C)(2)(ii)(B).

**C.     Much Information Regarding the Reasonableness of Fees for Recordkeeping Services is in the Sole Possession of Defendants**

76.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants.  The same is true for Plaintiff and this Plan, as Plaintiff does not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

77.     Other information has also not been made available to Plaintiff.

---

[28] *Id.* at 1.

19

78.     For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.  *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (401(k) excessive fee case which reversed the district court's grant of summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—i.e., a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'") (internal citation omitted); *see also Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

79.     Cerulli Associates[29] stated in early 2012 that more than half of the plan sponsors asked indicated that they "'are likely to conduct a search for [a] recordkeeper within the next two years.'"  These RFPs were conducted even though many of the plan sponsors indicated that they "'have no intention of leaving their current recordkeeper.'"[30]

80.     Generally, any RFPs, if conducted, would not be made available to plan participants.  The same is true for Plaintiff here who does not have direct access to such

---

[29] "Since 1992, [Cerulli] ha[s] powered financial services firms with in-depth analysis and strategic recommendations." CERULLI ASSOCIATES, https://www.cerulli.com/.

[30] *Recordkeeper Search Activity Expected to Increase Within Next Two Years*, CERULLI ASSOCIATES (Jan. 8, 2013), available at https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/ (internal quotation omitted).

information.

81.    Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes.  These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions. Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

82.    In short, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Walmart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

83.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiff, such as Form 5500s filed with the DOL.  By analyzing comparable plans to the Plan, it is clear Defendants did not do their due diligence in choosing a Plan and/or negotiating for reasonable RKA fees.  Nor did Defendants do their due diligence in renegotiating the Plan's fees as years went on.

84.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants.

**III.     THE PLAN PAID UNREASONABLE RECORDKEEPING FEES AND THE PLAN'S FIDUCIARIES FAILED TO ENGAGE IN A PRUDENT PROCESS TO EVALUATE RECORDKEEPING FEES**

**A.     Vanguard as a Recordkeeper**

85.     Defendants appointed the Vanguard Group, Inc. as the recordkeeper to assist with administering the Plan (the "Recordkeeper" or "Vanguard").[31]

86.     During the Class Period, Vanguard was one of the top recordkeepers nationally as measured by assets being recordkept.  According to Summit Consulting Group, which provides "the most current, publicly available snapshot," Vanguard is ranked third:

TOP PROVIDERS (RECORDKEEPERS)[32]

| Rank | Provider Name | Total 401(k) Assets ($MM) | Market Share (%) | Key Plan Types Served |
|---|---|---|---|---|
| 1 | Fidelity Investments | 2,037,733 | 43.7% | Corporate 401(k), 403(b) |
| 2 | Empower Retirement | 493,577 | 10.6% | Corporate 401(k), 457(b) |
| 3 | Vanguard Group | 454,223 | 9.7% | Corporate 401(k), 403(b) |
| 4 | Alight Solutions | 434,737 | 9.3% | Corporate 401(k), non-profit plans |
| 5 | Principal Financial Group | 322,976 | 6.9% | Corporate 401(k), 401(a), 403(b) |

///

---

[31] *See, e.g.*, 2024 Auditor's Report, at 6 ("[T]he Vanguard Group, Inc. has been appointed as the recordkeeper"); *see also, e.g.*, 2023 Form 5550 at Schedule C.

[32] *Largest 401k Providers: Top 10 by Assets and Participants*, SUMMIT CONSULTING GROUP (May 1, 2025), https://www.geauxsummit401k.com/largest-401k-providers/.

22

87.     The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

**B.      The Plan's Recordkeeping Services Agreement with Vanguard Should Have Been Comparable to Similar Plans Vanguard Managed**

88.     As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct an RFP.

89.     Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA services by soliciting competitive bids from other recordkeepers to perform the same services currently being provided to the plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries. Plan fiduciaries need only request a bid from salespeople at other service providers. For plans with as many participants as the Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote while others might only require the number of participants.

90.     Prudent plan fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable. Prudent plan fiduciaries should also inquire with its current recordkeeper regarding its other plans it administers and the costs those plan participants pay in fees.

91.     Having received bids, the prudent plan fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services.

92.     Here, it appears that Defendants failed to conduct an RFP in the years leading up

to or at least during the putative Class Period.[33]  The fact that the Plan had the same recordkeeper in place, Vanguard, since at least 2019[34] with little meaningful change (and even an increase) in the already excessive RKA rate strongly suggests that the Plan fiduciaries failed to act in the best interests of Plan participants when they failed to genuinely attempt to seek a competitive market rate for RKA fees, especially when the number of participants increased. Had Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

93.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct an RFP to any recordkeeper including any of the above top ten recordkeepers who were peers of Vanguard and capable of providing lower recordkeeping fees. Had Defendants sought an appropriate market rate through an RFP, it's likely either the recordkeeper would have been changed at some point or Vanguard would have agreed to pay a lower rate.

94.    Looking at just a couple retirement plans recordkept by Vanguard during even half the span of the Class Period further demonstrates that plans with over a billion dollars in assets under management, and having over 10,000 plan participants (the last tranche in the 2021 BrightScope ICI study[35]), were *able to obtain recordkeeping fees from Vanguard that were below the fees of the Plan even though the Plan had a greater bargaining advantage with its immense size* than all the other plans and should have been able to command much lower recordkeeping fees:

---

[33] The 2019 CVS Health Future Fund 401(k) Plan Form 5500 is the oldest available on the DOL's Form 5500 Search feature.

[34] But Vanguard may have been the recordkeeper for longer.  *See supra* note.

[35] *See infra* ¶ 105.

24

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[36] |
|---|---|---|---|---|
| Kaiser Permanente 401(k) Retirement Plan | 2023 | $19,708,272,899 | 175,631 | $12.23 |
| Kaiser Permanente 401(k) Retirement Plan | 2022 | $16,058,823,184 | 159,120 | $10.52 |
| Kaiser Permanente 401(k) Retirement Plan | 2021 | $18,614,838,105 | 149,636 | $12.07 |
| Google, LLC 401(k) Plan | 2023 | $39,047,152,408 | 152,158 | $7.97 |
| Google, LLC 401(k) Plan | 2022 | $28,898,202,210 | 148,787 | $14.45 |
| Google, LLC 401(k) Plan | 2021 | $30,556,649,022 | 124,725 | $16.48 |
| CVS Health Future Fund 401(k) Plan | 2023 | $27,588,812,025 | 223,622 | $34.14 |
| CVS Health Future Fund 401(k) Plan | 2022 | $24,237,200,876 | 223,548 | $29.08 |
| CVS Health Future Fund 401(k) Plan | 2021 | $28,826,912,417 | 212,836 | $28.09 |

95.     Based on this table—in addition to the tables *supra* ¶¶ 5, 44, 46—the Plan in 2023 should have been able to obtain lower per participant recordkeeping fees from Vanguard based on its immense size and the routine nature of the recordkeeping services performed by Vanguard. As noted above, Vanguard largely offers the same services to its 401(k) clients.

96.     What Defendants knew, or should have known, was that Vanguard charges, and has charged, lower recordkeeping fees to other plans, ***much smaller in size to the Plan*** in terms of the number of participants (and thus plans with less bargaining power than the Plan), for the same routine recordkeeping services it offered to the Plan.

97.     However, the Plan's rates exceeded, by far, the reasonable rate for a plan of that size:

//

//

//

//

//

---

[36] Cost-per-participant was calculated using the method described *supra* note 2.

25

| Year | Participants ("PP") | Vanguard Per Participant Charge ("PPC") | Total Direct Costs (PP x PPC) |
|---|---|---|---|
| 2024 | 230,636 | $23.54 | $5,431,119 |
| 2023 | 223,622 | $34.14 | $7,636,591 |
| 2022 | 223,548 | $29.08 | $6,501,866 |
| 2021 | 212,836 | $28.09 | $5,979,386 |
| 2020 | 205,769 | $86.57 | $17,814,551 |
| 2019 | 130,635 | $19.39 | $2,534,130 |

98.     Apart from failing to reduce the Plan's recordkeeping fees through an RFP, the evidence also indicates the Plan's fiduciaries failed to leverage the Plan's massive size to negotiate lower recordkeeping fees.

99.     If the recordkeeping fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways. In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan.

100.     Regardless of the pricing structure negotiated by the plan fiduciary, the fiduciary must ensure that the fee paid to the recordkeeper for RKA services is reasonable for the level of services provided. Defendants failed to use their leverage as a jumbo plan with over $27 billion in assets and over 223,622 participants to negotiate reasonable RKA fees.

101.     Again, the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service for a ***much lower*** cost—including Vanguard itself, as well as others like Fidelity.

102.     In a recent lawsuit, where another top-3 recordkeeper's—Fidelity's— own multi-billion dollar plan (with "more than 58,000 participants") was sued, the "parties [] stipulated that

26

if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F. Supp. 3d 189, 199, 214 (D. Mass. 2020) (internal citations omitted).

103.    The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics.  The Plan here had nearly double the number of participants than the Fidelity plan had (meaning the Plan should have commanded lower fees) and was also a billion-dollar plan like the Fidelity plan.  And Vanguard is a top recordkeeper just like Fidelity.  *See supra* ¶¶ 86.

     **C.**     **The Plan's Recordkeeping Fees Were/Are Unreasonable When Benchmarked Against Other Similarly Situated Plans**

104.    At all times during the Class Period, the above fees were unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."[37]  Accordingly, the larger the plan, the lower the recordkeeping fee should be.

105.    To put things into perspective, when comparing retirement plan data, most publications utilize tranches.  For example, the leading publication that collects 401(k) data is "BrightScope/ICI."[38]  BrightScope categorizes plans in the following tranches:

//

---

[37] *Supra* ¶ 63.

[38] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2021*, (Aug. 2024), at 7, available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

EXHIBIT I.2

**Universe of 401(k) Plans**

Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2021

| | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| **Plan assets** | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Less than $1M | 345,145 | 53.8% | 5,625.2 | 7.4% | $102.1 | 1.3% |
| $1M to $10M | 245,638 | 38.3 | 13,438.8 | 17.6 | 787.4 | 10.0 |
| >$10M to $50M | 39,083 | 6.1 | 10,038.7 | 13.2 | 792.1 | 10.1 |
| >$50M to $100M | 5,195 | 0.8 | 4,480.3 | 5.9 | 363.4 | 4.6 |
| >$100M to $250M | 3,431 | 0.5 | 6,615.9 | 8.7 | 528.5 | 6.7 |
| >$250M to $500M | 1,390 | 0.2 | 5,437.4 | 7.1 | 485.4 | 6.2 |
| >$500M to $1B | 854 | 0.1 | 5,448.2 | 7.2 | 600.3 | 7.6 |
| More than $1B | 1,011 | 0.2 | 25,061.2 | 32.9 | 4,209.8 | 53.5 |
| All plans | 641,747 | 100.0 | 76,145.7 | 100.0 | 7,869.0 | 100.0 |

| | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| **Number of plan participants** | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Fewer than 100 | 575,252 | 89.6% | 12,043.9 | 15.8% | $1,041.1 | 13.2% |
| 100 to 499 | 52,175 | 8.1 | 10,156.2 | 13.3 | 839.6 | 10.7 |
| 500 to 999 | 6,597 | 1.0 | 4,592.5 | 6.0 | 416.2 | 5.3 |
| 1,000 to 4,999 | 5,989 | 0.9 | 12,405.4 | 16.3 | 1,358.0 | 17.3 |
| 5,000 to 9,999 | 890 | 0.1 | 6,205.8 | 8.1 | 784.2 | 10.0 |
| 10,000 or more | 844 | 0.1 | 30,741.8 | 40.4 | 3,429.9 | 43.6 |
| All plans | 641,747 | 100.0 | 76,145.7 | 100.0 | 7,869.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.
Source: BrightScope Defined Contribution Plan Database

106. Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own, as there are only 0.2% of plans in this category as of 2021. This exemplifies Defendants' market power and leverage in negotiating with recordkeepers.

107. The below chart depicting RKAs from 2023 demonstrates the unreasonably high Plan fees compared to the Plan's peers:

//

//

//

//

//

28

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[39] |
|---|---|---|---|---|
| Lowes 401(k) Plan | 2023 | $8,108,634,836 | 147,562 | $7.97 |
| Google, LLC 401(k) Plan | 2023 | $39,047,152,408 | 152,158 | $7.97 |
| IBM 401 (K) Plus Plan | 2023 | $57,428,456,306 | 154,910 | $1.23 |
| Microsoft Corporation Savings Plus 401K Plan | 2023 | $53,225,853,429 | 172,201 | $2.97 |
| Starbucks Corporation 401(k) Plan | 2023 | $4,096,838,458 | 161,998 | $15.19 |
| Kaiser Permanente 401(k) Retirement Plan | 2023 | $19,708,272,899 | 175,631 | $12.23 |
| TJX Companies 401(k) Savings Plan | 2023 | $3,180,545,680 | 125,614 | $12.99 |
| Salesforce 401(k) Plan | 2023 | $7,317,484,047 | 53,709 | $11.52 |
| Intel 401(k) Savings Plan | 2023 | $22,179,181,890 | 82,693 | $2.82 |
| CVS Health Future Fund 401(k) Plan | 2023 | $27,588,812,025 | 223,622 | $34.14 |

108.    The above chart demonstrates that for plans with more than a billion dollars and 100,000[40] participants, the Plan had one of the highest recordkeeping fees by a wide margin. As noted above, as of the end of 2023 there were only 80 401(k) plans with 100,000 or more participants.[41] ***The Plan's $34.14 per participant fee is over quadruple the average fee of $8.32 per participant for the nine other plans listed above.***

109.    This vast discrepancy between the Plan's recordkeeping fees existed for all years of the Class Period. Dating back to 2019, the Plan's recordkeeping fees remained among the highest for billion-dollar plans while consistently having some of the largest numbers of Plan participants, an aspect of the Plan that should have commanded much lower fees.

110.    As a point of emphasis, in 2023, there were only 217 defined contribution plans in

---

[39] *See supra* note 2.

[40] The chart also includes the Salesforce 401(k) Plan and Intel 401(k) Savings Plan, which have significantly *fewer than* 100,000 participants, but were still able to command a lower cost per participant charge, further tipping in Plaintiff's favor.

[41] This number was calculated using the DOL Form 5500 Search available at https://www.efast.dol.gov/5500Search/.

the country with over 50,000 participants,[42] and in 2021, there were only 844 with 10,000 participants or more,[43] meaning the Plan fiduciaries had tremendous bargaining power.

## CLASS ALLEGATIONS

111.    Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23. Plaintiff seeks to represent a class defined as all persons, except Defendants and its immediate family members, who were participants in or beneficiaries of the Plan, at any time between October 24, 2019 through the date of judgment (the "Class").

112.    **Numerosity:** The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 230,636 Plan "participants with account balances as of the end of the plan year."

113.    **Commonality:** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;
B. Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;
C. Whether Defendants failed to adequately monitor any other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
D. The proper form of equitable and injunctive relief; and
E. The proper measure of monetary relief.

114.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other

---

[42] This figure was calculated using the DOL search tool.

[43] *Supra* ¶ 105.

30

Class members and managed the Plan as a single entity.  Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

115.    **Adequacy:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

116.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSES OF ACTION**

**COUNT I**
**Breach of Fiduciary Duty of Prudence**

117.    Plaintiff incorporates by reference and re-allege herein all paragraphs alleged

31

above.  Plaintiff brings this cause of action on behalf of himself and members of the Class against Defendants.

118.    At all relevant times, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

119.    As fiduciary of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

120.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  Defendants also failed to control the costs of the Plan's recordkeeping and administrative costs.

121.    During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RKA fees paid to covered service provider Vanguard.

122.    During the Class Period, Defendants failed to regularly monitor the Plan's RKA fees paid to covered service provider Vanguard.

123.    During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Vanguard, in order to avoid paying objectively unreasonable fees for RKA services.  Defendants failed to do so.

124.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants

did not have processes in place to ensure that the Plan paid no more than a competitive reasonable fee for RKA services.  Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RKA services.

125.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RKA services.

126.    During the Class Period and because Defendants failed to regularly monitor the Plan's RKA fees paid to covered service providers, including but not limited to Vanguard, the Plan's RKA service fees were significantly higher than they would have been had Defendants engaged in this process.

127.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement and investment.

128.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan and participants all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in his Prayer for Relief.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries

129.    Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.  Plaintiff brings this cause of action on behalf of himself and members of the Class against Defendant.

130.    Defendants had the authority to appoint and remove members or individuals responsible for the Plan's RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

131.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

132.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

133.    Defendants breached their fiduciary duties by, *inter alia*:

    i.    Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RKA expenses;

    ii.   Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate through competitive bidding the availability of lower-cost recordkeepers; and

    iii.  Failing to remove individuals responsible for Plan RKA fees whose performance was inadequate in that these individuals continued to pay the same RKA costs even though benchmarking and using other similar comparators would have showed that maintaining Vanguard as record keeper was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

134.    As the consequences of the foregoing breaches of the duty to monitor for RKA fees the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

34

135.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RKA fees.  In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**COUNT III**
**Prohibited Transactions – 29 U.S.C. § 1106(a)(1)**

136.    Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.  Plaintiff brings this cause of action on behalf of himself and members of the Class against Defendant.

137.    Section 1106(a)(1) prohibits transactions between a plan and a "party in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>> * * *
>> (C) furnishing of goods, services, or facilities between the plan and party in interest;
>> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

29 U.S.C. § 1106.

138.    Congress defined "party in interest" to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C).  As a service provider to the Plan, Vanguard is a party in interest.  29 U.S.C. §1002(14)(B).

139.    By allowing the Plan to be locked into an unreasonable arrangement that required the Plan to use Vanguard as the recordkeeper even though Vanguard's recordkeeping fees were

35

unreasonable for the services provided, Defendants caused the Plan to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plans and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of the Plan's assets to Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D).  These transactions occurred each time the Plan paid fees to Vanguard.

140.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

141.    Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

142.    Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction.  Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually and on behalf of all other similarly situated Plan participants and beneficiaries, seeks judgment against Defendants, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c) A Declaration that Defendants have breached their fiduciary duties under ERISA;

(d) An Order compelling Defendants to make good to the Plan losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

(e) Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(f) An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(g) Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

(h) An award of pre-judgment interest;

(i) An award of costs pursuant to 29 U.S.C. § 1132(g);

(j) An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

(k) Such other and further relief as the Court deems equitable and just.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: October 24, 2025

Respectfully submitted,

By: */s/ Yitzchak Kopel*
        Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Caroline C. Donovan
1330 Avenue of the America, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
        cdonovan@bursor.com

*Attorneys for Plaintiff*

37